AES/DG
F. #2019R01319

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

PUSHPESH KUMAR BAID,
  also known as, "PK Jain,"

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

TO BE FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANT
(18 U.S.C. § 1349)

21-MJ-110

EASTERN DISTRICT OF NEW YORK, SS:

      CHRISTOPHER YOUN, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

      Upon information and belief, in or about and between April 2017 and October 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant PUSHPESH KUMAR BAID, also known as "PK Jain," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud, and to obtain money and property by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate and

foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been employed as a Special Agent with the FBI for approximately three years. While working for the FBI, I have participated in numerous investigations of criminal activity, and I am assigned to a squad tasked with investigating white collar crime, including securities fraud, wire fraud, mail fraud and money laundering, among other offenses. During the course of these investigations, I have conducted or participated in surveillance, undercover operations, the execution of search warrants and arrest warrants, debriefings of informants, interviews of witnesses, victims, and subjects, and reviews of recorded conversations and financial records.

2. I am familiar with the facts and circumstances set forth below from, among other things: (a) my personal participation in the investigation of this case, (b) discussions with other law enforcement agents involved in this investigation and (c) my review of emails, bank records and other sources of evidence.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant PUSHPESH KUMAR BAID, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set

forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein. In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

I.  The Defendant and Relevant Entities

4. The "Company," an entity the identity of which is known to your affiant, was a Limited Liability Company ("LLC") that was headquartered in Florida and had offices in New York, New York. The Company, which registered as an LLC in Florida in or about August 2016, represented itself on its website and in marketing materials as a factoring company. Factoring involves the sale of an invoice to a third-party for a discount. In a factoring transaction, the seller of an invoice obtains immediate funding from a buyer, and the buyer of an invoice makes a profit when the invoice is paid in full. The Company purported to be in the business of buying invoices.

5. The defendant PUSHPESH KUMAR BAID, also known as "PK Jain," was a citizen of India and a resident of Florida. The defendant was the Business Head of the Company. In or about January 2017, BAID filed a petition in Florida state court to legally change his name to "Pushpesh Jain." In his petition, BAID stated that he was the President of an entity called "Baid Global LLC" based in Florida.

6. "Co-Conspirator 1," an individual whose identity is known to your affiant, was a citizen and resident of India. Co-Conspirator 1 was the Chief Operating Officer of the Company.

7. "Co-Conspirator 2," an individual whose identity is known to your affiant, was a citizen of India. Co-Conspirator 2 was a partial owner of the Company.

8. "Co-Conspirator 3," an individual whose identity is known to your affiant, was a citizen of India. Co-Conspirator 3 was a partial owner of the Company.

9. "Individual 1," an individual whose identity is known to your affiant, was a resident of Queens, New York. Individual 1 was the Managing Director of the Company.

10. "Individual 2," an individual whose identity is known to your affiant, was a resident of New Jersey. Individual 2 was listed as the authorized person to manage the Company in its August 2016 articles of organization and identified as a Company representative in numerous Company documents, including contracts that were signed in Individual 2's name on behalf of the Company. Individual 2 was an employee at an international bank and a friend of the defendant PUSHPESH KUMAR BAID.

11. The "Investment Firm," an entity the identity of which is known to your affiant, was a Delaware Limited Liability Company controlled by two brothers ("Principal 1" and "Principal 2" and, collectively, the "Principals"). The Principals worked with a financial executive ("Executive 1"), who helped run the Investment Firm. The Investment Firm made investments on behalf of approximately 50 investors.

12. "Affiliate 1," an entity the identity of which is known to your affiant, was an affiliate of the Investment Firm and controlled by the Principals.

13. "Bank 1," an entity the identity of which is known to your affiant, is a bank headquartered in New York.

   14. "Bank 2," an entity the identity of which is known to your affiant, is a bank headquartered in Maryland.

II. The Fraudulent Scheme

 A. Overview

   15. In or about and between April 2017 and October 2019, the defendant PUSHPESH KUMAR BAID, together with others, conspired to defraud the Investment Firm, its investors and the Principals, by inducing the Investment Firm to invest in the Company through a series of material misrepresentations about, among other things, the individuals who purportedly operated the Company; the nature of the Company's business; the relationship between the Company and the entities with which it was purportedly factoring invoices; and the ways in which the Investment Firm's investments in the Company would be used.

   16. In or about and between March 2018 and October 2019, the Investment Firm invested approximately $108 million in the Company for the purpose of factoring invoices. In or about July 2019, the Investment Firm stopped receiving payments on invoices it had factored through the Company. At that time, the Investment Firm had approximately $31 million in unpaid invoices outstanding. To date, the Investment Firm has not received payments on those invoices. In or about April 2020, the Investment Firm filed for bankruptcy.

 B. The Company's Purported Factoring Business

   17. The Company represented itself as an international factoring company run by an executive team experienced in trade finance and specializing in factoring invoices of companies in particular industries and geographic regions.

18. For example, on or about April 25, 2017, the defendant PUSHPESH KUMAR BAID emailed an insurance broker, an entity the identity of which is known to your affiant, a presentation purporting to summarize the Company's business. The presentation stated that the Company had been factoring invoices since July 2016 and that it factored invoices totaling $2 million per month for approximately 50 "insured business houses." The presentation listed Individual 2 as the Company's President and Chief Executive Officer and stated that Individual 2 had previously worked at two of the largest international banks in the world. The presentation listed BAID as the Company's "Business Head" and identified him using only his alias, "PK Jain."

19. In or about late 2017, the Principals of the Investment Firm began speaking with Individual 1 about a potential business relationship between the Investment Firm and the Company. Individual 1 was the Managing Director of the Company and had previously worked with the Principals on unrelated business projects.

20. On or about November 1, 2017, Individual 1 emailed the Principals and Executive 1 a document purporting to summarize the Company's business and describing the terms under which entities, such as the Investment Firm, could participate in factoring invoices through the Company (the "Participation Summary"). According to the Participation Summary, the Company would enter into a "Master Participation Agreement" with a participant authorizing the Company "to invest on [the participant's] behalf in credit insured, non-recourse factored invoices covering shipments from Indian based sellers to purchasers in Hong Kong, UAE and Singapore." The Participation Summary further stated that the Company would "compile a weekly listing of invoices for 'in transit' merchandise that will be eligible for factoring the

subsequent week.  Each participant will have the option to select a participation program by invoice or simply opt to invest a fixed percentage (10% to 90%) of the advanced amount in all invoices or a subset of invoices."  The Participation Summary stated that "invoices are factored and advances of 80% of full merchandise invoice value are paid to seller only after documentary acceptance occurs at the purchaser's facility."

21. According to the Participation Summary, the Company "was started by a team of professionals with extensive knowledge and experience in international trade finance and [was] led by an experienced executive management team with successful track record of building a multi-million USD receivable finance business in emerging markets."  The Participation Summary further stated that the Company's "clients are small to medium sized export houses in India selling goods and services to 'credit insured corporates' in USA, UK, UAE, Hong Kong & Singapore" and that its corporate structure was "AML [Anti-Money Laundering] rule compliant."

22. In a section titled "Risk Management and Mitigation," the Participation Summary stated, among other things, that money would be advanced to sellers "only after irrevocable documented acceptance of goods by the purchaser is received by [the Company]."

23. With regard to the sellers whose invoices the Company factored, the Participation Summary stated they were reputed businesses in India.  With regard to the buyers who purchased goods sold by the sellers, the Participation Summary stated that they were "all reputed parties located in legally strong jurisdictions like Dubai, Singapore and Hong Kong."

C.     The Company's Factoring Relationship with The Investment Firm

24.     In or about November 2017, Principal 1 had a phone conversation with Co-Conspirator 1 and Individual 1 to continue discussions about the Company's factoring business.  During the call, Co-Conspirator 1 stated, in sum and substance, that the sellers whose invoices the Company factored were based in India and that the buyers who purchased goods sold by the sellers were mostly based in Hong Kong, Dubai and Singapore.  Co-Conspirator 1 further stated that the Company did not want to work with many new sellers because it preferred to work with sellers with whom it already had a relationship.

25.     In or about and between November 2017 and February 2018, the Investment Firm and the Company continued negotiations and discussed entering into a Master Participation Agreement.  During the negotiation period, representatives of the Company stated, in sum and substance and in part, that (i) the Company factored only invoices for which buyers received shipments for sellers; (ii) the sellers and buyers were independent from one another; (iii) each seller had hundreds of buyers; (iv) each seller factored only a subset of its business; and (v) the prices on the sellers' invoices were wholesale.  In addition, representatives of the Company provided representatives of the Investment Firm with, among other things, registers listing invoices it had factored and copies of its bank statements.

26.     In or about February 2018, the Company and the Investment Firm entered into a Master Participation Agreement.[1]   Under the terms of the Master Participation Agreement, the Company sent the Investment Firm participation schedules that included

---

[1] The Investment Firm entered into the Master Participation Agreement through Affiliate 1.

information for each invoice that the Company offered. The participation schedules included, among other things, the names of sellers and buyers, gross invoice amounts, insured amounts, amounts to be factored, the Investment Firm's proposed participation amount and the Investment Firm's profit share per invoice. During the course of the Company's relationship with the Investment Firm, the Company sent the Investment Firm participation schedules in advance of the Investment Firm's potential participation in the factoring of new invoices. These participation schedules were signed by the defendant PUSHPESH KUMAR BAID.[2]

27. At around the same time that the Company and the Investment Firm entered in the Master Participation Agreement, the Investment Firm facilitated the opening of a bank account in the Company's name at Bank 2. In connection with the account-opening process, the Company provided the Investment Firm and Bank 2 with, among other things, the passports of its purported principals, including Co-Coconspirator 2, Co-Conspirator 3 and Individual 1. The Company's account at Bank 2 had a Deposit Account Control Agreement ("DACA") with an account at Bank 1 in the name of Affiliate 1. Under the terms of the DACA, funds transferred into the Company's account at Bank 2 were automatically transferred into Affiliate 1's account. In connection with the execution of the DACA, Individual 1 told Principal 1 to send the agreement to Individual 1 at his address in Queens, New York.

28. After the Company's account at Bank 2 was opened, the Company's invoices instructed buyers to make wire payments to the Company at Bank 2. Nevertheless, in

---

[2] The participation schedules were signed via DocuSign, a platform that allows users to, among other things, electronically sign and send agreements. Records produced by DocuSign included an account in the name of "[The Company] Docusign" that sent numerous Company documents via DocuSign in or about 2019. The address for the "[The Company] Docusign" account was the address for Individual 1 in Queens, New York.

or about and between February 2018 and September 2018, purported buyers made payments to the Company at Bank 1.  On or about September 13, 2018, the Company received its first payment from a purported buyer at its account at Bank 2.

29. In or about February 2018, the Investment Firm made its first investment of approximately $2 million for the factoring of invoices with the Company.  The Investment Firm received its expected payments on the invoices and made profits on the investment.  During the following year, the Investment Firm participated in the factoring of approximately 1,379 invoices with the Company involving approximately 170 different buyers.  The Investment Firm received payments on those invoices and made profits on its investments.

30. However, in or about April 2019, Co-Conspirator 1 told Executive 1 that approximately 29 payments on factored invoices had been delayed.  Co-Conspirator 1 stated that a bank had randomly selected wires from buyers to the Company and requested additional information about them.  Co-Conspirator 1 further stated that the wires had been returned to the buyers who had purportedly sent them.

31. In or about May 2019, a representative of Bank 2 contacted Principal 1 and asked him for information about an entity ("MSB 1"), the identity of which is known to your affiant, which had made wire payments into the Company's account at Bank 2.  Principal 1 had not heard of MSB 1 and subsequently asked Co-Conspirator 1 what it was and why it (as opposed to the buyers) was paying the Company.  Co-Conspirator 1 stated that MSB 1 was a money services business ("MSB") whose sole purpose was to convert local currency to United States dollars.  Prior to this conversation, the Company and its representatives had not disclosed that MSBs were involved in the payment of factored invoices.  On the contrary, the Company

10

and its representatives had stated that payments to the Company (and then to the Investment Firm) were made directly by buyers.

32. After Co-Conspirator 1 stated that MSB 1 was making payments to the Company, Co-Conspirator 1 stated that other MSBs ("MSB 2" and "MSB 3"), the identities of which are known to your affiant, would be used in place of MSB 1. In or about May 2019, payments to the Company came from an account in the name of MSB 2.

33. On or about June 20, 2019, Co-Conspirator 1 forwarded Executive 1 an email purporting to attach a "Trust or Company Service Provider" license for MSB 3. The document, which purported to be from the Hong Kong Companies Registry, was fake. A search of the publicly-available database of Hong Kong-licensed providers revealed no entry for MSB 3.

34. In or about July 2019, the Investment Firm stopped receiving payments from the Company on invoices it had factored. At that time, the Investment Firm had approximately $31 million in unpaid invoices outstanding.

35. On or about October 7, 2019, the defendant PUSHPESH KUMAR BAID met with Co-Conspirator 1, Individual 1 and the Principals in New York. The meeting was consensually recorded. During the meeting, Co-Conspirator 1 stated, in sum and substance and in part, that: (i) sellers, buyers and MSBs all participated in an integrated payment cycle in which buyers paid MSBs, MSBs paid the Company, the Company paid sellers and the sellers gave money to the MSBs to give back the buyers; (ii) MSBs were involved in a duty-drawback scheme in India, in which they profited through the refunding of duties paid on goods purportedly exported from India; (iii) MSB 1 was controlled by an individual who introduced the

11

Company to the sellers whose invoices it purportedly factored; (iv) Co-Conspirator 1 did not know if the buyers were real companies; (v) the invoices that the Investment Firm factored were inflated; and (vi) shipments from sellers to buyers may not have contained actual products.

36. On or about and between October 8, 2019 and October 9, 2019, the defendant PUSHPESH KUMAR BAID met with Co-Conspirator 1, Individual 1, the Principals and Executive 1 in New York. The meeting was consensually recorded. During the meeting, BAID stated, in sum and substance and in part, that: (i) the Company paid the sellers, the sellers paid the MSBs, and the MSBs used the funds in part to execute their duty drawback scheme; (ii) MSBs were involved in the Company's business from the outset; (iii) MSBs invested some of the Investment Firm's funds in the Indian stock market; (iv) some of the Investment Firm's money was stuck in MSB bank accounts because of an investigation by the Indian government into the duty-drawback scheme; (v) the factored invoices were fabricated; (vi) the buyers did not make payments; and (vii) Individual 2, who previously had been listed as the Company's President and Chief Executive Officer, was involved in forming the Company but had no role in the Company after that.

D. The Defendant's Affiliation With the Purported Sellers

37. In or about September 2016, a purported seller ("Seller 1"), the identity of which is known to your affiant, opened a bank account at Bank 1. The defendant PUSHPESH KUMAR BAID was one of two individuals who signed a "business signature card" in connection with the opening of the account. In or about and between 2018 and 2019, the Investment Firm participated in the factoring of approximately 143 Seller 1 invoices that totaled

approximately $ 14,244,758.  The website associated with the purported seller is no longer publicly available.

38. In or about and between October 2017 and April 2019, the Seller 1 bank account received approximately $10,066,519.97 in transfers from two accounts associated with the Company; approximately $200,000 from an account in the name of MSB 1; and millions of dollars in other transfers from other sellers whose invoices the Company was purportedly factoring.  During the same period, approximately $281,000 in cash was withdrawn from the Seller 1 account.  All of the cash withdrawals were signed by the defendant PUSHPESH KUMAR BAID.

39. The Company also had bank accounts at Bank 1.  The defendant PUSHPESH KUMAR BAID was one of three individuals who signed a "business signature card" in connection with the opening of one of the Company's accounts on or about October 3, 2017.  The other two signatories on that account were Co-Conspirator 2 and Individual 1.

40. In or about April 2019, another bank account was opened in the name of Seller 1 at a bank headquartered in the state of Georgia ("Bank 3"), the identity of which is known to your affiant.  The defendant PUSHPESH KUMAR BAID was not a signatory on that account.  In or about and between April 2019 and September 2019, the Seller 1 bank account at Bank 3 received approximately $2.95 million from accounts in the name of the Company or its affiliates.  During that same time period, the Seller 1 account transferred approximately $95,000 to an account in the name of BAID.

41. In or about September 2019, a bank account was opened at Bank 3 in the name of MSB 1. One of the two signatories on the MSB 1 bank account was also a signatory on the Seller 1 account at Bank 3.

42. In or about April 2019, numerous Limited Liability Companies were registered in Florida in the names of sellers for whom the Company was purportedly factoring invoices. According to the registered agent for these Florida companies, the defendant PUSHPESH KUMAR BAID requested the registrations of these companies.

43. On or about January 24, 2020, Individual 2 was deposed in connection with a civil lawsuit brought by the Investment Firm and its affiliates against, among others, the Company and its principals. Individual 2, who had been listed as a principal of the Company and purportedly signed numerous contracts on its behalf, stated that he/she had never worked for the Company. Individual 2 further stated that he/she was a friend of the defendant PUSHPESH KUMAR BAID.

III. Conclusion

WHEREFORE, your affiant respectfully requests that an arrest warrant be issued for the defendant PUSHPESH KUMAR BAID so that he may be dealt with according to law.

Because public filing of this document could result in a risk of flight by the defendant PUSHPESH KUMAR BAID, as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

Dated:  Brooklyn, New York
        January 26, 2021

CHRISTOPHER YOUN
Special Agent, FBI

Sworn to before me by telephone this
27 day of January, 2021

*Cheryl L. Pollak*

THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

15